**Virginia MATTIX–HILL, Petitioner,**

*v.*

**Gwendolyn RECK (formerly Gwendolyn Erwin), individually and as next friend of Amy Reck, a minor, Respondent.**

**No. 95–1319.**

Supreme Court of Texas.

May 31, 1996.

Rehearing Overruled July 8, 1996.

Lynn E. Carter, Austin, for petitioner.

Jimmy W. Nettles, Cheryl Ann Schultz, Beaumont, for respondent.

PER CURIAM.

The issue in this case is whether there is any evidence that a Texas Department of Human Services ("DHS") caseworker intentionally inflicted emotional distress upon the mother of a child placed in DHS custody. The court of appeals reversed the trial court's judgment notwithstanding the verdict, holding that there was some evidence to support the jury's finding of intentional infliction of emotional distress, and reinstated a jury award of $400,000 in actual damages. —— S.W.2d —— [1995 WL 866910]. Because the caseworker's actions did not rise to the level of intentional infliction of emotional distress, we reverse that part of the judgment of the court of appeals.

Fourteen-year-old Amy Reck accused her stepfather Kenneth Erwin of sexually molesting her. DHS removed Amy from her home by court order in the spring of 1989

because her mother Gwendolyn Reck ("Reck") refused to believe the molestation had occurred and refused to require Erwin to leave the family's home. DHS placed Amy in a foster home. While Amy was in DHS custody, Reck frequently spoke to and met with DHS caseworkers and supervisors. Because Reck continued to live with Erwin for a number of months after Amy's removal, DHS considered placing Amy permanently with her natural father or with her maternal grandparents. Virginia Mattix–Hill, one of Amy's caseworkers, advised Reck in July 1989 that Amy would not be returned to her. Eventually, Erwin confessed to Reck that he had molested Amy, and Reck separated from him and initiated divorce proceedings.

In November 1989, Amy ran away from her foster home shortly after warning a foster parent and Mattix–Hill that she would do so. Mattix–Hill telephoned Reck to inform her of Amy's actions. During the conversation, Mattix–Hill also asked Reck to come to Mattix–Hill's office to sign a plan of permanent placement for Amy, as discussed at a meeting DHS had conducted with Reck a few days earlier. Reck testified at trial that she was very upset by Mattix–Hill's phone call, became hysterical, and had to be driven home from work.

Amy was missing for three days, during which she was allegedly raped by one or more men in Orange, Texas, while she was under the influence of drugs, alcohol, or both. Two days after Amy returned to the foster home, DHS returned her to Reck's custody.

Reck, individually and as next friend of Amy, and Reck's other two children filed suit under the Texas Tort Claims Act against DHS, Mattix–Hill, and four other DHS employees. The Recks alleged negligent use of tangible personal property, bad faith, intentional infliction of emotional distress, malice, gross negligence, and an unlawful civil conspiracy to "break up the family unit by permanent removal of Amy Reck." All of the claims arose from DHS' custody of Amy and from the DHS investigation of Amy's allegations of sexual molestation by Erwin and of rape in Orange, Texas. A jury awarded $3.5 million in damages to the Recks from DHS and three of the individual defendants.

However, the trial court granted judgment notwithstanding the verdict in favor of all defendants. The Recks appealed only the claims against the individuals. The court of appeals affirmed the trial court's judgment as to all defendants except Mattix–Hill. The court held that there was some evidence of intentional infliction of emotional distress by Mattix–Hill because she asked if Reck would sign the placement plan during the same telephone conversation in which Reck was informed that Amy was missing. —— S.W.2d ——. Accordingly, the court of appeals reversed the trial court's judgment in favor of Mattix–Hill and reinstated a jury award of $400,000 in actual damages against her.

■ On appeal to this Court, Mattix–Hill first asserts that there is no evidence of conduct that would constitute intentional infliction of emotional distress. We agree.

■ The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Liability for outrageous conduct should be found " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 621 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Insensitive or even rude behavior does not amount to outrageous behavior. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994).

Reck alleged that Mattix–Hill caused her severe emotional distress by waving Erwin's criminal records at her and then refusing to allow Reck to see the records, by pushing Reck to encourage Amy to take birth control pills and implying in the same conversation that girls like Amy continue having sex after they first become sexually active, and by not bothering to obtain the last name of one of the men who allegedly gave Amy drugs and raped her. Reck went on to allege that

Mattix–Hill had caused her severe emotional distress by setting up "barricades" and developing a plan to permanently prevent Reck from regaining custody of Amy after Erwin confessed to Reck that he had molested Amy, by implying that Amy's drugging and raping was "nothing but a party" to Amy, and by telling Reck she would never get Amy back. Reck also alleged that Mattix–Hill attempted to take advantage of Reck when Reck was hysterical over Amy's disappearance from the foster home by trying to get Reck to sign the permanent placement plan.

Neither the court of appeals nor this Court is required to consider whether certain of Reck's allegations rise to the level of intentional infliction of emotional distress. The court of appeals correctly held that the record did not substantiate Reck's allegations that Mattix–Hill attempted to intimidate Reck with Erwin's criminal records, that Mattix–Hill failed to obtain the last name of one of the men alleged to have drugged and raped Amy, and that Mattix–Hill had characterized Amy's alleged drugging and raping as "nothing but a party."

The court was also correct in concluding that Mattix–Hill's discussion of Amy's sexual activity and recommendation of birth control pills was not extreme or outrageous behavior sufficient to constitute intentional infliction of emotional distress under *Twyman*. —— S.W.2d ——.

However, the court of appeals held that Mattix–Hill's telephone conversation with Reck when Amy had run away was some evidence of intentional infliction of emotional distress. We disagree. Mattix–Hill's behavior was not "extreme and outrageous." Both telephoning Reck about Amy's disappearance and requesting Reck to sign the placement papers were part of Mattix–Hill's job as a DHS caseworker. It must also be recognized that DHS caseworkers are often involved in emotionally charged situations, and that they may be confronted with conflicting interests and duties. They strive to protect the child, to treat the parents fairly, and to further the goals of society. Contacting Reck about Amy's disappearance was not "reckless" or "outrageous." To the contrary, it was appropriate under the circumstances.

Nor was a request that Reck sign the placement papers or the timing of that request "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965).

We note that the court of appeals indicated that Mattix–Hill's July 1989 statement that Reck would never get Amy back, standing alone, did not constitute extreme or outrageous conduct, but that it could be considered in conjunction with other acts. —— S.W.2d at ——. For the same reasons that the telephone conversation between Mattix–Hill and Reck cannot constitute intentional infliction of emotional distress, this statement does not support the jury's verdict.

Because there is no evidence of intentional infliction of emotional distress, we do not reach Mattix–Hill's additional arguments that there was legally insufficient evidence of severe emotional distress and that the judgment against her was barred by the doctrine of official immunity and by section 101.106 of the Texas Civil Practice & Remedies Code.

Accordingly, pursuant to Rule 170 of the Texas Rules of Appellate Procedure and without hearing oral argument, the Court reverses the judgment of the court of appeals as to Mattix–Hill and renders judgment that Reck take nothing.